**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **SPENCER MAYHEW** and **ROSALIE NOREN**, individually and behalf on all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**CANDID COLOR SYSTEMS, INC.**, an Oklahoma corporation,<br><br>Defendant. | No. 5:24-CV-0814-JD<br><br>Hon. Judge Jodi W. Dishman |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Spencer Mayhew ("Mayhew") and Rosalie Noren ("Noren," and together with Mayhew, "Plaintiffs"), individually and on behalf of all others similarly situated, bring under Federal Rules of Civil Procedure 15(a)(1)(B) and 23 this Second Amended Class Action Complaint against Defendant Candid Color Systems, Inc. ("CCS" or "Defendant"). In support of their Second Amended Class Action Complaint, Plaintiffs state and allege as follows:

**NATURE OF THE CASE**

1. This is a class action for damages arising from Defendant's violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et. seq*. ("BIPA"). Defendant has violated BIPA by illegally collecting and using Plaintiffs' biometric identifiers and biometric information ("biometrics") without informed written consent, and are understood to have done the same to countless other similarly situated individuals.

2. The Illinois legislature has recognized that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric facilitated transactions." *Id.*

3. In response to these concerns, the legislature enacted BIPA, which provides that a private entity may not obtain or possess a person's biometrics unless it: (1) informs that person in writing that biometrics will be collected or stored; (2) informs that person in writing of the specific purpose and length of term for which such biometrics are being collected, stored and used; (3) receives a written release from the person for the collection of his or her biometrics; and (4) publishes publicly available written retention schedules and guidelines for permanently destroying the biometrics it collects or stores. Furthermore, BIPA prohibits private entities from profiting in any way from a person's biometrics.

4. CCS provides an online platform for the marketing and sale of photos taken at school graduation ceremonies and youth sporting events (among other types of events).

5. CCS's platform uses facial recognition technology. In CCS's words, its "[i]ntegrated facial recognition makes finding images easy," because "consumers can click on one of their images to see all of their images." In other words, CCS's facial recognition software can identify facial images in a particular photograph and locate potentially-matching facial images among other photographs in a gallery. This can be done only by extracting from each photo data representing the unique geometry of each facial image so

that comparisons can be made. CCS's platform—and its integrated facial recognition—has been used to market and sell photos, including those of Plaintiffs Spencer Mayhew, Rosalie Noren, and others.

6. Under BIPA, "scan[s] of . . . face geometry" are biometrics, 740 ILCS 14/10, so Defendant cannot collect or use them unless BIPA is complied with. Yet, as described further in this Second Amended Complaint, Defendant does not comply with BIPA. Defendant has collected, stored, used, and profited from the biometrics of hundreds of Illinois residents, many of whom never had any idea that Defendant was collecting their biometrics.

7. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") to recover the statutory damages that BIPA authorizes of $5,000.00 for each intentional or reckless violation, and $1,000.00 for each negligent violation. It is reasonably probable that such damages exceed $75,000 as to Plaintiffs Mayhew and Noren individually (each of whom allege five distinct violations and had their biometrics extracted from four or more photographs), and over $5 million in aggregate as to the class, which is believed to comprise at least five hundred members who each sustained at least one negligent violation.

**PARTIES**

8. Plaintiff Spencer Mayhew is, and at all times relevant to this action has been, a citizen of Madison County, Illinois.

9. Plaintiff Rosalie Noren is, and at all times relevant to this action has been, a citizen of Christian County, Illinois.

10. Defendant CCS is an Oklahoma corporation with its principal place of business in Oklahoma. It may be served through the Oklahoma Secretary of State at 421 N.W. 13th Street, Suite 210, Oklahoma City, Oklahoma 73103.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. Alternatively, this Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which the size of the proposed class exceeds 100 members, there is diversity of citizenship between at least one member of the putative class of plaintiffs and one defendant, and the amount in controversy exceeds $5 million, exclusive of interests and costs.

12. This Court has personal jurisdiction over CCS because CCS is a citizen of Oklahoma and may be served in Oklahoma.

13. Venue is proper in this judicial district under 28 U.S.C. § 1391 because CCS resides within this judicial district.

## FACTS COMMON TO ALL COUNTS

### *BIPA Regulates the Use of Illinois Citizens' Biometrics*

14. In the early 2000s, the Illinois legislature found that "[m]ajor national corporations" were using locations within Illinois to experiment with "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS 14/5(c).

15. One such company, Pay By Touch, provided retailers throughout Illinois with fingerprint scanners that were used to collect customers' biometric information and link it to their financial accounts. In 2007, Pay By Touch filed for bankruptcy. The bankruptcy trustee listed the customers' biometric information as an asset and sought to sell it to pay off creditors.

16. The Illinois legislature was concerned by the prospect of unique biometric identifiers being sold or otherwise distributed without the consent of the Illinois citizens to which they belonged. In 2008, the legislature responded to the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information" by enacting BIPA. Illinois House Transcript, 2008 Reg. Sess. No. 276.

17. BIPA Section 15(a) provides that

> [a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

18. Under BIPA Section 15(b), it is unlawful for a private entity to

> collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:
>
> (1) informs the subject … in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject … in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used: and

> (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

740 ILCS 14/15(b).

19. And under BIPA Section 15(c), "[n]o private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

20. As described throughout this Second Amended Complaint, CCS violated all three prongs of BIPA Section 15(b) by collecting, storing, and using biometrics without informed written consent. CCS also violated BIPA Section 15(a) by failing to provide a publicly-available written policy regarding its schedule and guidelines for retaining and permanently destroying biometrics or by complying with such a policy. Finally, CCS violated BIPA Section 15(c) by using biometrics to facilitate the sale of photographs through the CCS online platform.

***CCS's Platform Uses Biometrics***

21. CCS is a photography business that represents itself as "a leader in event photography products and services, connecting photographers with innovative products and workflow solutions that increase sales, and improve overall efficiency." According to CCS, it "ha[s] the tools to help [photographers] effectively market and sell images from events both small and large." CCS maintains a website at https://www.candid.com/.

22. The products and services that CCS offers include a web-based "Ecommerce platform" that allows professional photographers to market and sell photos to consumers.

Photographers can access and use the Ecommerce platform from an onsite computer or mobile device.

23. The features available through CCS's Ecommerce platform include what CCS itself describes as "facial recognition." CCS tells potential photographer clients that "[i]ntegrated facial recognition makes finding images easy," and describes its facial recognition feature as follows: "With this ability built into our website your consumers can click on one of their images to see all of their images. By eliminating the need to search for their images customers are more likely to buy." The facial recognition feature can be applied to photos after photographers upload the photos to their respective accounts on CCS's Ecommerce platform.

24. CCS claims that benefits of its facial recognition feature include "ID[ing] more images faster and more accurately," and that "[p]hotographers love to use our facial recognition feature to get more images to consumers FAST."

25. CCS's facial recognition feature is made possible only through the collection of biometrics.

26. Biometrics as defined under BIPA include "scan[s] of . . . face geometry." 740 ILCS 14/10.

27. Upon information and belief, CCS's facial recognition feature works by scanning photographs for facial images and extracting data representing the unique geometry of each facial image in each photograph (sometimes called a "faceprint").

28. The image below, taken from a page on CCS's website touting the facial recognition feature,[1] illustrates how facial recognition extracts a faceprint, which then can be used to locate other photographs that are likely to contain the same face:

## Facial Recognition

An easier and FASTER way for your customers to view their pictures.




**This is a game changer**

Finally, the solution we have been looking for in photography. It will change how you shoot events. You can now shoot events you could not market in the past, including:

- Graduation Processionals
- Graduation Friends and Family
- Buddy Shots
- Large Parties

29. The illustration, which shows a geometric grid of dots and lines superimposed over a young woman's face, is a visual representation of how a faceprint is extracted from a photograph containing a facial image.

30. CCS therefore facilitates the sale of photographs through its Ecommerce platform by collecting the biometrics of the individuals depicted in photographs uploaded to the platform, even if those individuals never knowingly dealt with CCS.

31. CCS maintains a system and records for tracking photographers' use of the Ecommerce platform. For example, CCS can determine whether photos depicting particular individuals who have been photographed have been uploaded to the Ecommerce

[1] https://www.candid.com/facial-recognition/

platform (so long as the photographer has uploaded information identifying the individuals by name), as well as the identity of the photographer who uploaded the photos.

32. CCS collects an "Ecommerce fee" ranging from 2% to 6% or more on the photos purchased through its Ecommerce platform.

***CCS Is Responsible for the Data Used in Facial Recognition***

33. The facial recognition feature that is integrated into CCS's Ecommerce platform is powered by a Microsoft Azure software product. Microsoft Azure is a comprehensive cloud computing platform that allows individuals and organizations to rent computing power, storage, and software services through the internet. The software services available through Microsoft Azure include one known as "Azure Face" (or sometimes, "Face").

34. According to Microsoft, Azure Face "provides AI algorithms that detect, recognize, and analyze human faces in images."

35. Microsoft further explains that the Azure Face facial recognition process involves four steps. First, "[a]n image is captured." Second, "AI image recognition software reads the geometry of the face in the image by looking at the distance between key facial features, creating a unique facial template." Third, "[t]he facial template is compared to a database of known, stored, or available faces." Fourth, "[a] determination is made if a match is found in the existing database." These steps are depicted in the image below, captured from the Microsoft Azure website:




36. The Azure Face facial recognition process involves biometrics. Microsoft provides the following disclaimer to Azure Face users:

> If you are using Microsoft products or services to process Biometric Data, you are responsible for: (i) providing notice to data subjects, including with respect to retention periods and destruction; (ii) obtaining consent from data subjects; and (iii) deleting the Biometric Data, all as appropriate and required under applicable Data Protection Requirements.

37. Use of Azure Face is governed by several standard agreements between Microsoft and its customer (in this case, CCS). Those agreements include the Microsoft Customer Agreement and the Microsoft Products and Services Data Protection Addendum ("Data Protection Addendum").

38. The Microsoft Customer Agreement includes the following definitions:

> "Customer Data" means all data, including all text, sound, video or image files, and software, that are provided to Microsoft or its Affiliates by, or on behalf of, Customer and its Affiliates through use of Online Services. Customer Data does not include Professional Services Data.
>
> * * *
>
> "End User" means any person Customer permits to use a Product or access Customer Data.
>
> * * *

> "Online Services" means Microsoft-hosted services to which Customer subscribes under this Agreement. It does not include software and services provided under separate license terms.
>
> * * *
>
> "Personal Data" means any information relating to an identified or identifiable natural person.
>
> * * *
>
> "Product" means all Software and Online Services that Microsoft offers under this Agreement as identified in the Product Terms, including previews, prerelease versions, updates, patches, and Fixes from Microsoft. Product availability may vary by region. "Product" does not include Non-Microsoft Products.

39. Consequently, under the Microsoft Customer Agreement, **(i)** Azure Face is a Product and an Online Service; **(ii)** CCS's photographer clients who use the Azure Face integration of CCS's Ecommerce platform are End Users; **(iii)** photos that are analyzed with the Azure Face integration of CCS's Ecommerce platform are Customer Data and Personal Data; and **(iv)** the facial templates and other data (including biometrics) that are collected when photos are analyzed with the Azure Face integration of CCS's Ecommerce platform are Customer Data and Personal Data.

40. The Microsoft Customer Agreement contains the following terms regarding the Customer's responsibility for End Users and for obtaining required consents from third parties:

> Customer will control access to, and use of, the Products by End Users and is responsible for any use of the Products that does not comply with this Agreement.
>
> * * *

> Microsoft and its Affiliates, and their respective agents and subcontractors, will process Customer Data, Personal Data, and Professional Services Data as provided in this Agreement and the [Data Protection Addendum], which is incorporated by reference. Before providing Personal Data to Microsoft, Customer will obtain all required consents from third parties (including Customer's contacts, Partners, distributors, administrators, and employees) under applicable privacy and data protection laws.

41. The Data Protection Addendum likewise contains the following definitions:

> "Customer Data" means all data, including all text, sound, video, or image files, and software, that are provided to Microsoft by, or on behalf of, Customer through use of the Online Service. Customer Data does not include Professional Services Data.
>
> "Data Protection Requirements" means the GDPR, Local EU/EEA Data Protection Laws, and any applicable laws, regulations, and other legal requirements relating to (a) privacy and data security; and (b) the use, collection, retention, storage, security, disclosure, transfer, disposal, and other processing of any Personal Data.
>
> * * *
>
> "Personal Data" means any information relating to an identified or identifiable natural person. An identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person.
>
> "Product" has the meaning provided in the volume license agreement. For ease of reference, "Product" includes Online Services and Software, each as defined in the volume license agreement.

42. The Data Protection Agreement further provides that "Personal Data provided to Microsoft by, or on behalf of, Customer through the use of the Online Service is also Customer Data."

43. Consequently, under the Data Protection Agreement, **(i)** Azure Face is a Product and an Online Service; **(ii)** photos that are analyzed with the Azure Face integration

of CCS's Ecommerce platform are Customer Data and Personal Data; **(iii)** the facial templates and other data (including biometrics) that are collected when photos are analyzed with the Azure Face integration of CCS's Ecommerce platform are Customer Data and Personal Data; and **(iv)** the BIPA is a Data Protection Requirement.

44. The Data Protection Agreement contains the following terms regarding the Customer's obligation to apply with laws, "including laws related to biometric data," and responsibility for providing notice and obtaining consents as may be necessary:

> Customer must comply with all laws and regulations applicable to its use of Products and Services, including laws related to biometric data, confidentiality of communications, and Data Protection Requirements. Customer is responsible for determining whether the Products and Services are appropriate for storage and processing of information subject to any specific law or regulation and for using the Products and Services in a manner consistent with Customer's legal and regulatory obligations. Customer is responsible for responding to any request from a third party regarding Customer's use of Products and Services, such as a request to take down content under the U.S. Digital Millennium Copyright Act or other applicable laws.
>
> * * *
>
> If Customer uses Products and Services to process Biometric Data, Customer is responsible for: (i) providing notice to data subjects, including with respect to retention periods and destruction; (ii) obtaining consent from data subjects; and (iii) deleting the Biometric Data, all as appropriate and required under applicable Data Protection Requirements.

45. The Data Protection Agreement contains the following terms regarding ownership of Customer Data:

> Microsoft will use and otherwise process Customer Data, Professional Services Data, and Personal Data only as described and subject to the limitations provided below (a) to provide Customer the Products and Services in accordance with Customer's documented instructions and (b) for business operations incident to providing the Products and Services to Customer. As between the parties, Customer retains all right, title and interest

> in and to Customer Data and Professional Services Data. Microsoft acquires no rights in Customer Data or Professional Services Data, other than the rights Customer grants to Microsoft in this section. This paragraph does not affect Microsoft's rights in software or services Microsoft licenses to Customer.

46. Consequently, under the Microsoft Customer Agreement and the Data Protection Agreement, **(i)** CCS is responsible for providing the notices and obtaining the consents required under the BIPA; **(ii)** CCS retains all right, title and interest in the facial templates and other data (including biometrics) that are collected through the Azure Face integration in its Ecommerce platform; **(iii)** CCS is responsible for deleting biometrics obtained through the Azure Face integration in its Ecommerce platform.

***CCS Operates the "Grad Photo Network"***

47. CCS owns the trademark for and sometimes does business as "Grad Photo Network." In describing the Grad Photo Network on its website, CCS states that "[w]e are the largest network of professional photographers for graduation and commencement ceremonies." CCS further offers to connect potential customers (*i.e.*, high schools, colleges, or universities) to photographers within the Grad Photo Network, stating "We have solutions for your commencement needs. . . . Looking for a local provider of these solutions? We can connect you."[2]

48. CCS actively maintains a website for its Grad Photo Network at https://www.gradphotonetwork.com/ (the "Network Website"). The Network Website

[2] https://www.candid.com/grad-photo-network/

integrates the CCS Ecommerce platform and allows consumers to order photos that have been taken by photographers who are part of CCS's Grad Photo Network.

49. CCS makes available on the Network Website documents titled "Terms and Conditions"[3] and "Privacy Policy."[4] The Terms and Conditions state that they apply to persons who "us[e] this site or submit[ ] an order for photographs via this platform owned by [CCS] and used in association with its' affiliates."

50. The Terms and Conditions make clear that CCS exercises control over the Network Website. For example, the Terms and Conditions state that

a. "CCS may, but is not obligated to, monitor the information, including photographs, that could be posted on this site."

b. "CCS may refuse orders for products with indecent, obscene, lewd, or illegal material or that may violate copyrights or privacy rights of others or for any other reason."

51. The Terms and Conditions also provide, consistent with CCS's receipt of an "Ecommerce fee," that CCS exercises control over orders that are placed through the Network Website. The Terms and Conditions state that

a. "When you place an order on this site you will receive Email confirmation that CCS has received your order. Your receipt of an electronic or other form of order confirmation does not signify CCS's acceptance or confirmation of your order."

b. "CCS reserves the right at any time after receipt of your order to accept, decline, or limit your order for any reason, whether or not your credit card has been charged."

[3] https://www.gradphotonetwork.com/qpplus/conditionsofuse.

[4] https://www.gradphotonetwork.com/qpplus/privacypolicy.

c. "CCS reserves the right, at any time after receipt of your order, to supply less than the quantity you ordered of any item."

d. "CCS may require additional verifications or information before accepting any order."

e. "CCS works cooperatively with the Event Photographer to ensure that all goods produced by us are acceptable to the customer."

f. "Depending on the event photographed and the type of products ordered, items will either be forwarded to your Event Photographer for distribution to you, or they will be mailed directly to you via United States Postal Service standard delivery."

g. "CCS charges sales taxes, the rate of which is set at the direction of the Event Photographer."

52. The Privacy Policy likewise reflects CCS's control over the Network Website and orders placed through the Network Website. It states that

a. "When you place an order with CCS we collect your name, address, telephone number, credit card information, email address, and IP address. CCS and our affiliates use this information to fill your order, to communicate with you about your order, and to aid us in troubleshooting any problems that may develop. CCS and our affiliates may also use this information to tell you about new products and services."

b. "CCS operates with a network of photographers across the nation. Your name, address, telephone number, payment method and order detail will be forwarded to the company that photographed your event. Only the last four digits of your credit card number are forwarded to the event photographer."

c. "In addition to the information we collect directly from you, CCS also monitors general site use and traffic patterns to improve our website, customer service and the products offered."

53. Kabance Photo Services, Inc. ("Kabance") is a photography company that is part of the Grad Photo Network. Photos that Kabance takes as part of the Grad Photo Network, including those of Plaintiffs, are made available for sale on the Network Website.

***CCS Collected, Used, and Profited from Plaintiffs' Biometrics Without Their Consent***

**Plaintiff Spencer Mayhew**

54. Plaintiff Spencer Mayhew graduated from Collinsville High School in 2023. He attended the school's graduation ceremony held on May 13, 2023, at Collinsville High School, 2201 S. Morrison Avenue, Collinsville, St. Clair County, Illinois 62234.

55. During the graduation ceremony, photographers working on behalf of Kabance, as part of the Grad Photo Network, took photos of Mayhew, and subsequently uploaded them to the Network Website. Plaintiffs are without knowledge as to where the photos were uploaded to the Network Website or scanned for biometrics, but given the functionality described in paragraphs 22 and 31, it reasonably can be inferred that the photos may have been uploaded or scanned for biometrics in Illinois, and that such information may be accessible to CCS and available to Plaintiffs through discovery.

56. The photos of Mayhew can be viewed by accessing the Network Website at https://www.gradphotonetwork.com/QPPlus/SearchNames.aspx?EventID=2244221&_AccountNumber=32298, entering the last name "Mayhew," clicking the "Continue" button, and then clicking the "View Proofs" button next to Mayhew's name.

57. When any individual photo of Mayhew on the Network Website is selected (by clicking on it), a dotted-line rectangular field automatically appears around Mayhew's face.

58. Clicking inside the rectangular field that appears around Mayhew's face reloads the webpage and returns other photos depicting Mayhew. The address of the webpage that is returned (https://www.gradphotonetwork.com/QPPlus/Proofs.aspx?

EventID=2244221&AccountNumber=32298&FaceId=1162829) includes, at the end, a "FaceId" that is unique to Mayhew.

59. This functionality is not limited to Mayhew. One of the photos of Mayhew depicts a school official handing Mayhew his diploma. A dotted-line rectangular field also appears around the school official's face, and clicking within that field reloads the webpage and returns other photos depicting the school official. Many of those photos depict the school official handing a diploma to other students, and the other students likewise appear with a dotted-line rectangular field around their faces. Clicking within the field around any student's face reloads the webpage and returns other photos depicting that student. With respect to both the school official and the other students, the webpage address that is returned after clicking on a person's face includes at the end a "FaceID" that is unique to that person.

60. This functionality shows—consistent with CCS's representations described in paragraphs 21 through 24 and 28 through 29, above—that CCS's Ecommerce platform recognized Mayhew's face, extracted Mayhew's faceprint, and compiled photos containing Mayhew's face. CCS therefore collected Mayhew's biometrics.

61. After Mayhew's graduation ceremony, his mother received an email with a link to the Network Website soliciting her to purchase photos of Mayhew.

62. Mayhew's mother, who is an Illinois resident, purchased photos of Mayhew through the Network Website (Order ID: VG13016798). Mayhew' s mother purchased both digital prints and physical prints that were shipped to her residence in Illinois. The

confirmation email that Mayhew's mother received for her purchase listed her billing and shipping address in Collinsville, Illinois.

63. Mayhew was never informed (in Illinois or elsewhere) that CCS would collect or use his biometrics.

64. Mayhew was never informed (in Illinois or elsewhere) that CCS would profit from the use of his biometrics by using them to locate photographs of him taken at the graduation ceremony and thereby facilitate sales of those photographs from which CCS collected fees. Because CCS did so without Mayhew's knowledge or consent, and in violation of the BIPA Section 15(c), Mayhew unknowingly lost control over his unique biometrics and had violated his rights in and ownership to those unique biometrics without compensation.

65. Mayhew never gave CCS consent (in Illinois or elsewhere) to collect, use, or profit from his biometrics.

**Plaintiff Rosalie Noren**

66. Plaintiff Rosalie Noren graduated from Blackburn College in 2021. She attended the school's graduation ceremony held on May 15, 2021, at Blackburn College in Carlinville, Illinois. Blackburn College is a private institution.

67. During the graduation ceremony, photographers working on behalf of Kabance, as part of the Grad Photo Network, took photos of Noren, and subsequently uploaded them to the Network Website. Plaintiffs are without knowledge as to where the photos were uploaded to the Network Website or scanned for biometrics, but given the functionality described in paragraphs 22 and 31, it reasonably can be inferred that the

photos may have been uploaded or scanned for biometrics in Illinois, and that such information may be accessible to CCS and available to Plaintiffs through discovery.

68. The photos of Noren can be viewed by accessing the Network Website at https://www.gradphotonetwork.com/QPPlus/SearchNames.aspx?EventID=2147496&AccountNumber=32298, entering the last name "Noren," clicking the "Continue" button, and then clicking the "View Proofs" button next to Noren's name.

69. When some individual photos of Noren on the Network Website are selected (by clicking on them), a dotted-line rectangular field automatically appears around Noren's face. Notably, however, this functionality is not present for the photos in which Noren is wearing a face mask.

70. For the photos for which the rectangular field appears around Noren's face, clicking inside the rectangular field reloads the webpage and returns other photos depicting Noren. The address of the webpage that is returned (https://www.gradphotonetwork.com/QPPlus/Proofs.aspx?EventID=2147496&AccountNumber=32298&FaceId=604077) includes, at the end, a "FaceId" that is specific to Noren.

71. This functionality is not limited to Noren. Some of the photos of Noren depict her with other graduates or school officials. In most cases, a dotted-line rectangular field also appears around those persons' faces, and clicking within any of those fields reloads the webpage and returns other photos depicting that person. In each case, the webpage address that is returned after clicking on a person's face includes at the end a "FaceID" that is unique to that person. Notably, however, this functionality is not present for persons who are wearing face masks.

72. This functionality shows—consistent with CCS's representations described in paragraphs 21 through 24 and 28 through 29, above—that CCS's Ecommerce platform recognized Noren's face, extracted Noren's faceprint, and compiled photos containing Noren's face. CCS therefore collected Noren's biometrics.

73. After Noren's graduation, she believes that she received one or more emails soliciting her to purchase the photos like that described in paragraph 47.

74. Noren was never informed (in Illinois or elsewhere) that CCS would collect or use her biometrics.

75. Noren was never informed (in Illinois or elsewhere) that CCS would profit from the use of her biometrics by using them to locate photographs of her taken at the graduation ceremony and thereby facilitate sales of those photographs from which CCS collected fees. Because CCS did so without Noren's knowledge or consent, and in violation of the BIPA Section 15(c), Noren unknowingly lost control over her unique biometrics and had violated her rights in and ownership to those unique biometrics without compensation.

76. Noren never gave CCS consent (in Illinois or elsewhere) to collect, use, or profit from her biometrics.

***CCS Has Collected, Used, and Profited from the Biometrics of Countless Other Illinois Residents***

77. The Network Website hosts far more photos than just those of Mayhew and Noren.

78. Kabance's account on the Network Website, for example, hosts photos of other participants in the Collinsville High School and Blackburn College graduation

ceremonies, as well as photos from other events held in Illinois that likely depict Illinois residents.

79. Upon information and belief, CCS has collected the biometrics (in the form of data representing the unique geometry of facial images) of hundreds of other individuals whose facial images are contained in photographs uploaded to the Network Website in the same manner as described above with respect to the photos of Mayhew and Noren.

80. Upon information and belief, CCS does not make available to the public a written policy establishing a retention schedule and guidelines for permanently destroying the biometrics in their possession. Indeed, CCS represents that it stores images uploaded to its Ecommerce platform for "15+ years." Given the functionality described in paragraphs 57 through 59 and 69 through 71, above, it can reasonably be inferred that biometrics are stored on the Network Website for the same length of time to maintain that functionality.

81. Upon information and belief, CCS has derived revenue or profits from the sale of photographs of Illinois residents taken at Illinois-located events and benefits from its purposeful, intentional commercial relationship with photographers who are based in Illinois or take photos at events held in Illinois, including Kabance.

82. Upon information and belief, CCS's collection, storage, use, and profit from the biometrics of Illinois residents all have been done without the informed written consent of the subject individuals (or their legal representatives).

83. CCS's Ecommerce platform includes not just the Network Website, but also online sales platforms under the names "TSS Photography" (https://orders.tssphotography.com/), "Party Pics" or "Party Pic Network"

(https://www.partypics.com/), "Quic Pics" (https://quicpics.com/), "Race Photo Network" (https://www.racephotonetwork.com/), and "Team Photo Network" (https://www.teamphotonetwork.com/).

84. Upon information and belief, in addition to Kabance, other photographers operating in Illinois have used the various online platforms within CCS Ecommerce platform to capture the biometrics of Illinois residents. Though the identities of those photographers presently are unknown to Plaintiffs, they presumably are known to CCS, and discovery can determine whether those photographers also collected biometrics (or facilitated CCS's collection of biometrics) by using CCS's platform.

***CCS's Collection and Use of Biometrics Violates BIPA***

85. Defendant's practice of collecting, storing, using, and profiting from Illinois' residents' biometrics violates BIPA Sections 15(a), (b)(1)–(3), and (c).

86. **BIPA Section 15(a).** Defendant possesses biometrics, but does not make available to the public a written policy that establishes a retention schedule and guidelines ensuring that the biometrics they collect are destroyed when the initial purpose for collecting them has been satisfied or within three years of the individual's last interaction with Defendant, whichever comes first, and does not comply with those requirements. Defendant therefore violates BIPA Section 15(a).

87. **BIPA Section 15(b)(1).** Defendant collects, captures, receives through trade, or otherwise obtains biometrics without first informing the subject (or the subject's legally authorized representative) in writing that biometrics are being collected or stored. Defendant therefore violates BIPA Section 15(b)(1).

88. **BIPA Section 15(b)(2).** Defendant collects, captures, receives through trade, or otherwise obtain biometrics without first informing the subject (or the subject's legally authorized representative) in writing of the specific purpose and length of term for which the biometrics are being collected, stored, or used. Defendant therefore violates BIPA Section 15(b)(2).

89. **BIPA Section 15(b)(3).** Defendant collects, captures, receives through trade, or otherwise obtains biometrics without first receiving from the subject (or the subject's legally authorized representative) an executed written release. Defendant therefore violates BIPA Section 15(b)(3).

90. **BIPA Section 15(c).** Defendant profits from the biometrics that it possesses by using them to facilitate the sale of photographs through the Network Website and participating in those transactions. Defendant therefore violates BIPA Section 15(b)(3).

**CLASS ALLEGATIONS**

91. This action is brought under Rule 23 of the Federal Rules of Civil Procedure by the named Plaintiffs on their own behalf and on behalf of a proposed Class of all other persons similarly situated, defined as follows:

> All residents of the State of Illinois depicted in photos that were taken within the State of Illinois and that had Defendant's facial recognition technology applied to them within the applicable limitations period and before the date notice is disseminated.

92. The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members presently is unknown to

Plaintiffs, it is ascertainable by appropriate discovery or is known or available to Defendant. Upon information and belief, the class includes thousands of members.

93. Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class. These common questions include, without limitation:

a. Whether Defendant captured, collected, stored or used the biometrics of Plaintiffs or the Class members.

b. Whether Defendant informed Plaintiffs or the Class members in writing that their biometrics were being captured, collected, stored, or used.

c. Whether Defendant informed in writing Plaintiffs or the Class members of the specific purpose and length of term for which their biometrics were being captured, collected, stored, or used.

d. Whether Defendant received from Plaintiffs, the Class members, or their legally authorized representative an executed written release before Defendant captured, collected, stored, or used their biometrics.

e. Whether Defendant developed and made available to the public a written policy establishing a retention schedule and guidelines for permanently destroying biometrics at the earlier of the time when the initial purpose for collecting or obtaining the biometrics was satisfied or within three years of an individual's last interaction with Defendant.

f. Whether Defendant profited from Plaintiffs' or the Class members' biometrics by using them to facilitate the sale of photographs through the their online platforms.

94. Class treatment provides a fair and efficient method for the adjudication of the controversy described in this Second Amended Complaint because the controversy affects a large number of persons. Class treatment therefore provides an appropriate and effective method for Plaintiffs and Class members to assert their claims in a manner that can fairly be managed without unnecessary expense or duplication. The expense and

burden of individually litigating the claims of each Class member are impracticable and would waste judicial resources.

95. Furthermore, class treatment allows litigation of claims that, given the expenses of litigation, likely would be insufficient in monetary value to support separate actions. Class treatment allows litigation to be conducted in a single forum, which aids judicial economy and efficiency, promotes parity among the claims of individual Class members, and results in judicial consistency.

96. In contrast, the prosecution of separate actions by individual members of the Class would create a risk of:

a. inconsistent or varying adjudications with respect to individual members of the Class; and

b. adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

97. Plaintiffs will fairly and adequately protect the interests of the Class that they represent. Plaintiffs' interests as the Class representatives are consistent with those of the Class members.

98. Plaintiffs are represented by counsel experienced in class action and other complex litigation.

99. Plaintiffs and their counsel envision no difficulties in managing this case as a class action.

**COUNT I – VIOLATION OF BIPA SECTION 15(a)**
**740 ILCS 14/15(a)**
**Failure to Develop or Comply with Retention Policy**
**(By Plaintiffs and the Class Against Defendant)**

100. Plaintiffs incorporate all preceding allegations as if fully set forth herein.

101. BIPA Section 15(a) requires private entities in possession of biometrics to "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

102. Defendant is a "private entity" as defined in BIPA Section 10 [740 ILCS 14/10] in that CCS is an Oklahoma corporation that is not a State or local government agency.

103. Defendant possesses the biometrics of Plaintiffs and the Class members as described throughout this Second Amended Complaint.

104. Defendant never has developed a publicly-available written policy that complies with the requirements of BIPA Section 15(a) and does not abide by such a policy.

105. Defendant's possession of Plaintiffs' and the Class members' biometrics without developing or complying with a publicly-available written policy consistent with the requirements of BIPA Section 15(a) violates BIPA Section 15(a).

106. Plaintiffs and the Class members are aggrieved by Defendant's possession of their biometrics without developing or complying with a publicly-available written policy consistent with the requirements of BIPA Section 15(a).

107. As a direct result of Defendant's violations of BIPA Section 15(a), Plaintiffs and the Class members are entitled to statutory damages as set forth in BIPA Section 20 [740 ILCS 14/20].

**COUNT II – VIOLATION OF BIPA SECTION 15(b)(1)**
**740 ILCS 14/15(b)(1)**
**Failure to Inform of Collection or Storage**

108. Plaintiffs incorporate all preceding allegations as if fully set forth herein.

109. BIPA Section 15(b)(1) makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored." 740 ILCS 14/15(b)(1).

110. Defendant is a "private entity" as defined in BIPA Section 10 [740 ILCS 14/10] in that CCS is an Oklahoma corporation that is not a State or local government agency.

111. Defendant collected, captured, received through trade, or otherwise obtained the biometrics of Plaintiffs and the Class members as described throughout this Second Amended Complaint.

112. Defendant collected, captured, received through trade, or otherwise obtained the biometrics of Plaintiffs and the Class members without first informing in writing

Plaintiffs or the Class members (or their legally authorized representatives) that their biometrics were being collected or stored.

113. Defendant's collection and storage of Plaintiffs' and the Class members' biometrics without first informing them (or their legally authorized representatives) in writing violates BIPA Section 15(b)(1).

114. Plaintiffs and the Class members are aggrieved by Defendant's collection and storage of their biometrics without having first informed them (or their legally authorized representatives) in writing as required under BIPA Section 15(b)(1).

115. As a direct result of Defendant's violations of BIPA Section 15(b)(1), Plaintiffs and the Class members are entitled to statutory damages as set forth in BIPA Section 20 [740 ILCS 14/20].

## COUNT III – VIOLATION OF BIPA SECTION 15(b)(2)
## 740 ILCS 14/15(b)(2)
## Failure to Inform of Purpose and Length of Term

116. Plaintiffs incorporate all preceding allegations as if fully set forth herein.

117. BIPA Section 15(b)(2) makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: . . . (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used." 740 ILCS 14/15(b)(2).

118. Defendant is a "private entity" as defined in BIPA Section 10 [740 ILCS 14/10] in that CCS is an Oklahoma corporation that is not a State or local government agency.

119. Defendant collected, captured, received through trade, or otherwise obtained the biometrics of Plaintiffs and the Class members as described throughout this Second Amended Complaint.

120. Defendant collected, captured, received through trade, or otherwise obtained the biometrics of Plaintiffs and the Class members without first informing in writing Plaintiffs or the Class members (or their legally authorized representatives) of the specific purpose and length of term for which their biometrics were being collected, stored, or used.

121. Defendant's collection, storage, and use of Plaintiffs' and the Class members' biometrics without first informing them (or their legally authorized representatives) in writing of the specific purpose and length of term for which their biometrics were being collected, stored, or used violates BIPA Section 15(b)(2).

122. Plaintiffs and the Class members are aggrieved by Defendant's collection and use of their biometrics without having first informed them (or their legally authorized representatives) in writing of the specific purpose and length of term for which their biometrics were being collected or used as required under BIPA Section 15(b)(2).

123. As a direct result of Defendant's violations of BIPA Section 15(b)(2), Plaintiffs and the Class members are entitled to statutory damages as set forth in BIPA Section 20 [740 ILCS 14/20].

**COUNT IV – VIOLATION OF BIPA SECTION 15(b)(3)**
**740 ILCS 14/15(b)(3)**
**Failure to Obtain Written Release**

124. Plaintiffs incorporate all preceding allegations as if fully set forth herein.

125. BIPA Section 15(b)(3) makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: . . . (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative." 740 ILCS 14/15(b)(3).

126. Defendant is a "private entity" as defined in BIPA Section 10 [740 ILCS 14/10] in that CCS is an Oklahoma corporation that is not a State or local government agency.

127. Defendant collected, captured, received through trade, or otherwise obtained the biometrics of Plaintiffs and the Class members as described throughout this Second Amended Complaint.

128. Defendant collected, captured, received through trade, or otherwise obtained the biometrics of Plaintiffs and the Class members without first having obtained a written release executed by them or their authorized legal representative.

129. Defendant's collection, capture, or receipt through trade of Plaintiffs' and the Class members' biometrics without first having obtained an executed written release violates BIPA Section 15(b)(3).

130. Plaintiffs and the Class members are aggrieved by Defendant's collection, capture, or receipt through trade of their biometrics without first having obtained an executed written release as required under BIPA Section 15(b)(3).

131. As a direct result of Defendant's violations of BIPA Section 15(b)(3), Plaintiffs and the Class members are entitled to statutory damages as set forth in BIPA Section 20 [740 ILCS 14/20].

**COUNT V – VIOLATION OF BIPA SECTION 15(c)[5]**
**740 ILCS 14/15(c)**
**Profiting from Biometrics**

132. Plaintiffs incorporate all preceding allegations as if fully set forth herein.

133. BIPA Section 15(c) makes it unlawful for any private entity to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information.740 ILCS 14/15(c).

134. Defendant is a "private entity" as defined in BIPA Section 10 [740 ILCS 14/10] in that CCS is an Oklahoma corporation that is not a State or local government agency.

135. Defendant possesses the biometrics of Plaintiffs and the Class members as described throughout this Second Amended Complaint.

[5] Plaintiffs recognize that this Count was dismissed without prejudice by the Court's Order dated June 11, 2025 (ECF No. 41). Plaintiffs retain these allegations in this Second Amended Complaint only to prevent future dispute over whether the dismissal may be challenged on appeal. *See Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1516–18 (10th Cir. 1991).

136. Defendant profits from the biometrics of Plaintiffs and the Class members by using them to facilitate the sale of photographs through its Ecommerce platform.

137. Defendant's practice of profiting from Plaintiffs' and the Class members' biometrics violates BIPA Section 15(c) and deprives Plaintiffs and the Class members of control over their unique biometrics and their rights in and ownership to those unique biometrics without compensation.

138. Plaintiffs and the Class members are aggrieved by Defendant's practice of profiting from their biometrics in violation of BIPA Section 15(c).

139. As a direct result of Defendant's violations of BIPA Section 15(c), Plaintiffs and the Class members are entitled to statutory damages as set forth in BIPA Section 20 [740 ILCS 14/20].

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the proposed Class, respectfully requests the following relief with respect to each and every count alleged above:

A. certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure and appointment of the undersigned as class counsel;

B. a declaration that Defendant's conduct described throughout this Second Amended Complaint violates BIPA Sections 15(a), (b)(1)–(3), and (c);

C. injunctive and equitable relief as is necessary to protect Plaintiffs and the proposed Class from Defendant's ongoing violations of BIPA Sections 15(a), (b)(1)–(3), and (c);

D. statutory damages in the amount of $5,000.00 for each and every intentional or reckless violation of BIPA, as allowed under BIPA Section 20(2), and statutory damages in the amount of $1,000.00 for each and every negligent violation of BIPA, as allowed under BIPA Section 20(1);

E. their reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses, as allowed under BIPA Section 20(3) or other applicable law; and

F. such other relief as the Court deems just and appropriate.

Dated: October 23, 2026

Respectfully submitted,

/s/ Matthew J. Limoli

Matthew J. Limoli (admitted *pro hac vice*)
**THE DRISCOLL FIRM, P.C.**
301 Fayetteville Street, Ste. 1825
Raleigh, North Carolina 27601
Phone: (919) 582-6516
Fax: (314) 932-3233
matthew@thedriscollfirm.com

**THE DRISCOLL FIRM, LLC**
John J. Driscoll (admitted *pro hac vice*)
1311 Avenida Juan Ponce de Leon, Ste. 501
San Juan, Puerto Rico 00907
Phone: (314) 222-2605
Fax: (314) 932-3233
john@jjlegal.com

**THE TAWWATER LAW FIRM, P.L.L.C.**
Larry A. Tawwater, OBA No. 8852
Darren M. Tawwater, OBA No. 18854
B. Adam Myers, OBA No. 33985
14001 Quail Springs Parkway
Oklahoma City, Oklahoma 73134
Telephone: (405) 607-1400
Facsimile: (405) 607-1450
lat@tawlaw.com
dtaw@tawlaw.com
adam@tawlaw.com

**ATTORNEYS FOR PLAINTIFFS**

**JURY TRIAL DEMANDED**

**ATTORNEYS' LIEN CLAIMED**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 23, 2026, the foregoing document was electronically filed with the Clerk of Court and will be served by operation of the Court's CM/ECF system upon all registered parties.

/s/ Matthew J. Limoli
*Attorney for Plaintiffs*